UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

DENNIS J. WOESSNER,

      Plaintiff,

vs.                                                  Case No.  3:05-cv-769-J-MCR

JO ANNE B. BARNHART, Commissioner of
the Social Security Administration,

      Defendant.
_____/

**MEMORANDUM OPINION AND ORDER[1]**

This cause is before the Court on Plaintiff's appeal of an administrative decision denying his application for Social Security benefits.  The Court has reviewed the record, the briefs and the applicable law.  For the reasons set forth herein, the Commissioner's decision is **REVERSED** and the matter **REMANDED**.

**I.    PROCEDURAL HISTORY**

Plaintiff protectively filed an application for disability insurance benefits ("DIB") on June 5, 2001, alleging an inability to work since October 1, 2000.  (Tr. 75-77).  The Social Security Administration ("SSA") initially and on reconsideration denied this application.  (Tr. 66-67, 62-63).  Plaintiff then requested a hearing before an Administrative Law Judge (the "ALJ") on June 11, 2002.  (Tr. 61).  The plaintiff received three hearings before an

---

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge.  (Doc. 10).

Administrative Law Judge (the "ALJ")[2] on September 10, 2003, February 19, 2004, and July 15, 2004, respectively. (Tr. 48-51, 43-47, 27-30). On March 09, 2005, the ALJ issued a decision finding Plaintiff was not disabled. (Tr. 15-26). On May 03, 2005, Plaintiff filed a Request for Review by the Appeals Council. (Tr. 7-12). The Appeals Council denied Plaintiff's request for review on June 10, 2005. (Tr. 4-6). Accordingly, the ALJ's decision was the final decision of the Commissioner. (Tr. 4). Plaintiff timely filed his Complaint in the U.S. District Court on August 12, 2005. (Doc. 1).

## II.  NATURE OF DISABILITY CLAIM

### A.  Basis of Claimed Disability

Plaintiff claims to be disabled since October 1 2000, due to injuries to the left knee, irritable bowel syndrome, and colon problems. (Tr. 97). At the first hearing Plaintiff testified to additional problems including acid reflux disorder, hemorrhoids, pain in the right knee and numbness in both feet. (Tr. 305, 312-313).

### B.  Summary of Evidence Before the ALJ

Plaintiff was forty-eight years of age when the date last insured ("DLI") occurred on June 30, 2002. (Tr. 359, 358). Plaintiff completed a high school education and some vocational training. (Tr. 359). Plaintiff had past relevant work as a plumber, plumber's helper, cement mason and concrete finisher. (Tr. 81-84, 98). Plaintiff's medical history is summarized in the ALJ's decision. By way of summary, on August 8, 2000, Plaintiff sat down and noticed that his seat was covered in blood. (Tr. 313). Plaintiff sought medical

---

[2] The September 10, 2003 and February 19, 2004 hearings occurred before the Honorable Judge Haack, while the July 15, 2004 hearing occurred before the Honorable Judge Thompson. (Tr. 48-51, 43-47, 27-30).

attention and Dr. Fatemi performed a proctosigmoidoscopy, anal ulcerectomy, anoplasty and hemorrhoidectomy.  (Tr. 189).  After the operations the plaintiff was diagnosed with chronic anal ulcers and hemorrhoids.  Id.  Dr Fatemi later performed colonoscopy on February 19, 2001 with no remarkable results.  (Tr. 186).  However, Dr. Fatemi noted that the preparation for the procedure was "sub-optimal." Id.

On June 6, 2001, a magnetic resonance imaging ("MRI") was performed on Plaintiff's left knee, due to a twisting injury and anterior knee pain.  (Tr. 161).  The results of the MRI showed a horizontal tear involving the posterior horn of both medial and lateral meniscus with associated small perimeniscal cyst in the medial compartment.  Id.  The scan also showed a small Baker's cyst and joint fluid.  Id.  Additionally, the technician noted a presence of large varicosities in the medial knee adjacent to the proximal tibia.  Id.

Plaintiff sought treatment from Dr. Keller at the Jacksonville Orthopedic Institute starting in June 2001 and continuing through November of 2003.  (Tr. 211, 222).[3]  Plaintiff's primary complaint was knee pain.  Id.  On June 25, 2001, Dr. Keller diagnosed Plaintiff with degenerative joint disease and medial and lateral meniscal tears.  (Tr. 210).  Accordingly, Dr. Keller scheduled Plaintiff for arthroscopic surgery on his left knee.  Id.

In response to Plaintiff's complaint's of chest pain and in preparation for the arthroscopic surgery, Dr. Carriere, the Plaintiff's Primary Care Physician ("PCP"), referred Plaintiff to Dr. Campbell at Cardiology Consultants.  (Tr. 160).  Dr. Campbell performed a dual isotope stress test, a gated scan, and a quantitative scan on Plaintiff.  Id.  Dr. Campbell determined Plaintiff had patchy uptake throughout the myocardium, consistent with the

---

[3] Dr. Keller's November 17, 2003 notes state "see me in six months," indicating that treatment most likely continued after November 17, 2003.  (Tr. 243).

Plaintiff's body habitus.  Id.  Dr. Campbell also noted Plaintiff had a fixed inferior defect, consistent with disphragmatic attenuation.  Id.  Additionally, Plaintiff was determined to have shortness of breath, no evidence of coronary ischemia or scarring, a normal gated SPECT scan, and a left ventricular ejection fraction of 54%.  (Tr. 143, 160).  Accordingly, Dr. Campbell cleared Plaintiff for arthroscopic surgery.  (Tr. 205).

On August 22, 2002, Dr. Keller performed the arthroscopic evaluation on Plaintiff's left knee.  (Tr. 205).  Dr. Keller debrided a degenerative tear of the lateral mniscus, leaving a small rim of menisus behind.  Id.  During the procedure, Dr. Keller also removed all loose chondral fragments from Plaintiff's knee.  Id.  Dr. Keller noted there were no complications during the surgery.  Id.  The post-operative procedure report indicates Plaintiff was diagnosed with a degenerative tear of the lateral meniscus, grade 2 chondramalacia of the medial femoral condyle, and grade 1 chondromalacia of the patella.  (Tr. 162).  In the procedure report, Dr. Keller noted Plaintiff's patellofemoral joint showed signs of early stage chondromalacia.  Id.  The post-operative notes indicate Plaintiff continued to experience knee pain, tightness, and occasional "freezing up" long after the surgery.  (Tr. 201-203).  Accordingly, Dr. Keller recommended physical therapy.  (Tr. 201).  Plaintiff could not start his physical therapy because of chest pains.  (Tr. 292).  A note dated May 7, 2002, indicates Plaintiff was doing "relatively well" and showed no signs of swelling or effusion.  Id.  The note also mentions Plaintiff had been complaining of pain in his right knee.  Id.  An MRI was performed on Plaintiff's right knee and Dr. Keller scheduled an arthroscopic surgery for Plaintiff's right knee.  Id.  The surgery was performed in July 2002.  (Tr. 222).

In November 2003[4], Plaintiff began seeing another physician at the Jacksonville Orthopaedic Institute, Dr. Carrasquillo, for numbness in both legs and pains in his left foot. Id.  Dr. Carrasquillo referred Plaintiff to Dr. Collier of the Spine and Pain Institute for evaluation for polyneuropathy.  (Tr. 248).  Dr. Collier's report refers to Plaintiff as having a "chronic, waxing and waning numbness and tingling in both feet since the early 90s."  Id. Dr. Collier determined Plaintiff suffered from moderate polyneuropath and mild to moderate tarsal tunnel syndrome in his left foot.  (Tr. 249).

Plaintiff sought treatment for shoulder pain in January 2004 from Dr. Tandron.  (Tr. 236).  On January 21, 2004, Dr. Tandron ordered an MRI performed on the Plaintiff that revealed Plaintiff suffered from a supraspinatus tear and a cyst adjacent to the anterior labrum.  (Tr. 236, 257).  The MRI report states the Plaintiff's history as a  "48-year-old who reports nontraumatic left shoulder pain and arm numbness over several months."  (Tr. 257).

Two Residual Functional Capacity ("RFC") assessments were performed on Plaintiff. (Tr. 197, 219).  The first was completed on October 09, 2001 and the second assessment was completed May 20, 2002.  Id.  The first assessment found Plaintiff could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday and push and/or pull with no restrictions.  (Tr. 191).  Additionally, the assessment indicated Plaintiff could frequently balance, stoop, and kneel with the right side; and occasionally climb, crouch, crawl, and kneel with the left side.  (Tr. 192).  The second assessment indicated Plaintiff

---

[4] While this Court notes that November 2003 is past the Plaintiff's DLI, the records in question contain information relating to pre-DLI symptoms and will be discussed.  See Ivy v. Sullivan, 898 F.2d 1045 (5th Cir. 1990) (finding that post-DLI are relevant).

could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday and push and/or pull with no restrictions.  (Tr. 213).  Additionally, the assessment indicated Plaintiff could frequently balance, stoop, kneel, crouch, and crawl; and occasionally climb. (Tr. 214).

### C. Summary of the ALJ's Decision

A plaintiff is entitled to disability benefits when he is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than 12 months.  42 U.S.C. §§ 416(I), 423(d)(1)(A); 20 C.F.R. § 404.1505.  The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, he is not disabled.  29 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if a claimant's impairments (considering his residual functional capacity, age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled.  20 C.F.R. § 404.1520(f).  Plaintiff bears the burden of persuasion through step four, while at step five, the burden shifts to the Commissioner.  Bowen v. Yuckert, 482 U.S. 137, 146, 107 S.Ct. 2287 n.5 (1987).

In the present case, the ALJ determined Plaintiff met the nondisability requirements of the Social Security Act and was insured for benefits up to June 30, 2002. (Tr. 19). Accordingly, Plaintiff was required to show that his disability began on or prior to June 30, 2002. At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since his alleged onset date, October 1, 2000. (Tr. 25). At step two, the ALJ held "the claimant's history of left knee derangement ..., history of gastroesophageal reflux disease, and history of non-cardiac chest pains are considered severe." Id. (quotes omitted). At step three, the ALJ determined Plaintiff did not have an impairment, or any combination thereof, which met or equaled any of the impairments listed in Appendix 1, Subpart P of the Regulation No. 4. Id.

The ALJ further determined Plaintiff retained the residual functional capacity to "lift up to 20 pounds occasionally and 10 pounds or less more frequently, stand/walk 4 hours in an eight-hour workday and sit 4 hours in and eight-hour workday with a sit/stand option alternating at 30 minute intervals." Id. Additionally, the ALJ determined Plaintiff could not squat, crawl, climb or kneel, but could occasionally bend and stoop. Id. In making this determination, the ALJ found Plaintiff's assertions concerning his impairments and their impact on his ability to work were "not totally credible." Id. At step four, the ALJ utilized the testimony of a vocational expert ("V.E.") during the hearing to determine if Plaintiff could perform any of his past relevant work. (Tr. 386-391). The V.E. testified that all of Plaintiff's prior jobs had exertion levels ranging from heavy to very heavy physical exertion. (Tr. 389-390). Thus, the ALJ determined Plaintiff was unable to perform any of his past relevant work, because of Plaintiff's preclusion from the heavy to very heavy physical exertion range. (Tr. 23). At step five, the ALJ found that Plaintiff could perform "a significant range of light

work;" consequently, Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 23-25).

## III.   STANDARDS OF LAW

### A.   The Standard of Review

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 390, 91 S.Ct. 1420 (1971). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson, 402 U.S. at 401).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991); Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

**IV.   ANALYSIS**

Plaintiff argues one issue on appeal. Plaintiff believes the ALJ erred by failing to fully and adequately evaluate all of the medical evidence. (Doc. 15). Specifically Plaintiff argued the ALJ erred by not discussing three doctor's records within the final decision. Id.

The Commissioner responds that the ALJ did not err by failing to discuss the three Doctor's notes in the final decision, because there is no requirement that the ALJ discuss all evidence in his final decision. (Doc. 17).

**Whether the ALJ erred by failing to fully and adequately evaluate the medical evidence by not discussing all evidence in the record.**

When making a disability determination the law requires the ALJ to consider all evidence in the claimant's record. 20 C.F.R. §404.1520(a)(3). The ALJ is afforded broad discretion when deciding which evidence to accept or reject, but the ALJ must state the weight afforded to each piece of evidence and fully explain the reason for rejecting any evidence. See Sharfarz v. Bowen, 825 F.2d 278, 279 (11th Cir. 1987) ("In assessing the medical evidence in this case, the ALJ was required to state with particularity the weight he gave the different medical opinions and the reasons therefor."); Gibson v. Heckler, 779 F.2d 619, 623 (11th Cir. 1986) (reversing and requiring ALJ on remand to state the weight accorded to each item of impairment evidence and the reasons for his decisions on such evidence). While there is no requirement that an ALJ refer to every piece of evidence in decision, the ALJ must make it clear to a reviewing court that the claimant's condition was considered "as a whole." Dyer v. Barnhart, 395 F.3d 1206. 1211 (11th Cir. 2005).

In this case, the ALJ failed to discuss the records of Dr. Collier,  Dr. Tandron, and Dr. Carrasquillo, making it impossible to determine if the ALJ considered the Plaintiff's condition

"as a whole." (Tr. 249, 257, 248). Statements made during a hearing on July 15, 2004, indicate that the ALJ wrongly believed that medical evidence presented after the Plaintiff's DLI should not be considered. (Tr. 358, 369, 370, 384, 385). The law is clear that medical evaluations made after a claimant's insured status expires must be considered, if they provide information about a claimant's pre-expiration condition. See Boyd v. Heckler, 704 F.2d 1207, 1211 (11th Cir. 1997) (holding that physician's opinions have value even if the physician did not treat the plaintiff until after the plaintiff's date last insured), *superceded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1994); Ivy, 898 F.2d 1049. The medical records in question refer to symptoms occurring since the 90's, well before the Plaintiff's DLI of June 30, 2002. (Tr. 248). Additionally, the MRI ordered by Dr. Tandron, performed on January 21, 2004 referred in the history to a "48-year-old ... report[ing] nontraumatic left should pain and arm numbness." (Tr. 257). However, the Plaintiff would have been 50 years of age in 2004, not the 48 years of age referred to in the report. (Tr. 35). As the record stands, it is impossible for this Court to determine if Dr. Tandron made a mistake in age or if the doctor is referring to symptoms occurring while the Plaintiff was 48 years of age and therefore before the Plaintiff's DLI. (Tr. 257). Accordingly, this Court believes the medical records are probative because they contain claims of pre-DLI symptoms that must be considered by the ALJ when making a decision. As the court is unable to determine what role, if any, Dr. Collier's, Dr. Tandron's, or Dr. Carrasquillo's records played in the ALJ's decision to deny the Plaintiff's claim, it is unclear wether the evidence was ignored, overlooked, or rejected and therefore not clear to this Court that the Plaintiff's condition was fully considered.

The ALJ's failure to state the weight accorded to the opinions of Dr. Collier, Dr.

Tandron, and Dr. Carrasquillo requires that this cause be remanded to the Commissioner of Social Security for further proceedings not inconsistent with this opinion. This Court expresses no opinion as to whether Dr. Collier's, Dr. Tandron's, or Dr. Carrasquillo's opinions must be accepted or rejected; however, the ALJ is reminded that his decision must "enable [a reviewing court] to conclude that [the ALJ] considered [the Claimant's] medical condition as a whole." Dyer, 395 F.3d at 1211. The absence of statements about the weight given to Dr. Collier's, Dr. Tandron's, or Dr. Carrasquillo's records coupled with the ALJ's statements in the record, do not provide enough evidence for this Court to determine that the ALJ considered the Plaintiff's medical condition "as a whole."

Accordingly, the undersigned will remand the case to the ALJ, with the instruction that he should review the medical reports of Dr. Collier, Dr. Tandron, and Dr. Carrasquillo. Furthermore, the ALJ shall explain in detail the amount of weight afforded to each of the reports and if rejecting any of the records, fully explain why the records are being rejected, to make it clear that the Plaintiff's condition was considered "as a whole."

## V. CONCLUSION

For the foregoing reasons, the Clerk of the Court is directed to enter judgment pursuant to sentence four of 42 U.S.C. §405(g) **REVERSING** the Commissioner's decision and **REMANDING** this matter with instructions to (1) consider the medical opinions of Dr. Collier, Dr. Tandron, and Dr. Carrasquillo, and, if they are rejected, explain fully why they are being rejected. Thereafter, the Clerk is directed to close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this  26th  day of July, 2006.

*Monte C. Richardson*
MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record